McIntyre, Frances A., J.
AMENDED[1] MEMORANDUM OF DECISION ON JURY-WAIVED TRIAL INTRODUCTION
In early 1999, the Board of Selectmen of the Town of Dracut granted a special permit to the Trustees of the Severance Family Realty Trust for a truck terminal facility, subject to certain conditions as to when and where loading of trucks could occur. Severance Trucking commenced operation in December of 1999. On April 12, 2000, the Dracut Building Inspector issued Severance Trucking a permit violation for loading through the doors on the north side of the building, and a second on May 3, 2000. Simultaneously, Severance Trucking was informed that the Selectmen would hold a show cause hearing to consider amending the permit. After two hearings, the Selectmen voted to amend the special permit on May 9, 2000.
PROCEDURAL HISTORY
The enforcement action and the amendment process were each appealed to the Land Court, followed by various jury claims made by the plaintiff to the Superior Court. At the behest of the parties, this Court has entered an order that the Land Court actions are to be tried first.
Land Court action #264032 was focused on the process by which the Town sought to amend the permit; that has been decided by this Court adversely to the Town. The parties agreed that certain material facts existed which were undisputed and that certain questions of law could be decided by this Court under Mass.R.Civ.P. 56(d). This Court has earlier done so, essentially finding that the Selectmen were without jurisdiction to amend the permit as they did.[2]
Focus of the litigation then turned to the interpretation of the Special Permit; the question was whether it was ambiguous. In bifurcated fashion, this Court ruled the permit was unambiguous, concluding that Stipulation 2.c and 2.d of the Special Permit meant that there could be no loading or unloading of trucks through the doors on the north side of the Severance Truck terminal.[3] A final ruling on #264032 has entered this day.[4]
The instant case, Land Court action #265903, was focused on the enforcement activity. The Building Inspector’s Cease and Desist orders were appealed to and upheld by the Zoning Board of Appeals. The plaintiff appealed the ZBA ruling to the Land Court under M.G.L.c. 40A, §17, which has been transferred to the Superior Court. This Court has heard evidence in the appeal of the Zoning Board’s decisions.
FINDINGS OF FACT
On February 9, 1999, the Selectmen of the Town of Dracut (“the Selectmen') voted to grant a special permit (“the Special Permit”) to the Trustees of the Severance Family Realty Trust (“the Severance Trustees”) allowing use of the premises at 49 McGrath Road, Dracut (“the Locus”) for operation of a truck terminal facility subject to certain conditions. Among the conditions set forth in the Special Permit were the following, which were designated as Stipulation 2 thereof:
2. Hours of operation will be as follows:
a. General operating hours shall be 6:00 a.m. to 8:00 p.m. Monday through Friday only.
b. Any truck arriving after 8:00 p.m. shall be kept on the south side of the terminal building.
c. Internal movement of goods and loading of vehicles that are sealed flush to the building may take place during the hours of 8:00 p.m. to 6:00 a.m.
d. No truck loading or unloading shall take place on the north side of the terminal building after 8:00 p.m.[5]
The terminal was constructed and operations at the Severance Truck terminal at 49 McGrath Road in Dracut began in late December 1999. Sometime in February 2000, Selectman Warren Shaw came to the Building Inspector’s office with a woman named Susan Janeczek; her residential property abutted the Severance facility. Shaw introduced Janeczek as a friend.
*659 Susan Janeczek lived within 500 feet of the truck terminal. Shaw advised the Building Inspector that Janeczek had a complaint about noise from the terminal; Shaw told him to “do something about it.” This was the first time that Mr. Shaw had expressed a personal interest in a zoning issue.
Ernest Gauthier was the Building inspector for the town of Dracut. Previously employed in the same role in Hampton, NH, he had also had experience as a building contractor. Since these events, he has been a building inspector for the town of Winthrop. He is certified for appointment as a building inspector (or commissioner), having duly complied with the examination requirements.
Because Janeczek was an abutter to the terminal property, it was Gauthier’s proper function to investigate the complaints. The first complaint that came in was not from Janeczek, but contemporaneous to it. In addition to the complaints from Janeczek, he received noise complaints from named and anonymous citizens.
On February 22, 2000, the issue of noise at the terminal was the subject of a selectmen’s meeting. The Town Manager wrote to Severance describing the complaints and, by copy of the letter, asking the Building Inspector to look into this situation.
Sometime in February 2000, Building Inspector Gauthier visited the Severance premises. He observed that there was loading and unloading of trucks through the north side doors of the truck terminal after 8:00 PM in the evening.[6] Gauthier spoke to Kathryn Boyd and her brother who were members of the family realty trust and principals in the business. They showed him into the terminal and apprised him of the problems that they felt were contributing to the noise complaint.
Over the course of several meetings, Gauthier learned that the asphalt ramp under the truck doors on the dock facility was too high. This prevented the trucks from docking flush up against the terminal floor and door. This disparity in height necessitated the use of a small metal ramp to allow the passage of a forklift into the truck box when unloading freight and made for a very noisy operation. He further learned that the Severance family intended to grind down the height of the asphalt in order that the trucks could dock flush to the terminal floor. However, the hot top asphalt necessary to finish the job would not become available until the spring. This meant that the facility operated from February through April without trucks being sealed flush up to the terminal door. Not only was this was an opportunity for sound and heat to escape, but it defeated the sealing design which had been represented to the Town as a key feature of the terminal.
Once or twice more, Shaw brought Susan Janeczek to Gauthier’s office; on these occasions, Shaw told Gauthier to do something about it. Gauthier did not testify to any other statement or gesture of Shaw’s, or anything else that could objectively be described as intimidating.
The grinding down of the asphalt did not occur until mid-April. In the interim, to abate the noise of forklift traveling over the metal ramp, Severance installed rubber strips on the underside of the ramps into the truck boxes which dampened the noise.
From February until April 10, 1999, Gauthier carried out his responsibilities as Building Inspector under the mistaken belief that the terms of the Special Permit, as granted by the Selectmen as the Special Permit Granting Authority, were chiefly framed to control noise emanating from the truck terminal. In this time period, Gauthier understood that it was acceptable for Severance to load and unload trucks on the north side of the terminal building after 8:00 PM, if the noise problems abated. In late February to April 2000, Gauthier was aware that the Severance Trucking company was making efforts to reduce the noise problem at the plant.
On April 10, Gauthier made a written report to Dennis Piendak about the noise complaints. He outlined to him meetings he had on April 6th and 7th with the Severance family regarding the noise problem. Gauthier was still under the impression that the Special Permit had to do with noise and not the specifics of external truck loading.
It is noteworthy, however, that Gauthier was not familiar with the terms of the Special Permit.[7] I find that he did not read those terms or examine the Special Permit until April 10 or 11, 2000, despite the Town Manager’s February 24 request to advise the town on compliance issues.
On April 11, 2000, Gauthier was requested by Town Manager Piendak to attend the Selectmen’s meeting on that night. The town manager told him that the selectmen wanted to discuss the Severance truck terminal.
At that meeting, Gauthier decided that he should issue a Cease and Desist order against Severance. He had finally read the Special Permit “just before the meeting on Tuesday April 11.” He had talked to the Town Manager and Selectmen. He had come to understand (in substance) that Stipulation 2(d) was to be taken literally. It meant that there could be no external loading or unloading after 8:00 PM through doors on the north side of the terminal. On April 12, 2000 the first Cease and Desist order was issued by Mr. Gauth-ier to the Severance Truck facility.
At that same meeting, the Selectmen voted to hold a Show Cause hearing on April 25, 1999 and to amend the Special Permit.[8] This startled Gauthier who correctly thought that he was to enforce the zoning law. I detect nothing in this circumstance which actually undermined Gauthier’s independence.
On April 12, Gauthier entered his first Cease and Desist order instructing Severance not to permit any truck loading or unloading on the north side of the building after 8:00 PM. In his communications to *660 Severance, Gauthier wrote that it had been pointed out to him at the Board of Selectmen’s meeting on April 11 that Stipulation 2(d) meant that no truck loading or unloading should take place through the north side of the building after 8:00 PM.
The Board of Selectmen held their “Show Cause” hearing on April 25, 2000. Gauthier has no memory of attending that meeting. Therefore, I infer that he felt no pressure or intimidation as a result of that meeting.
This conclusion is reinforced by the fact that on April 28, 2000, Gauthier lifted the Cease and Desist order with regard to 20 north-side truck doors at the Severance Truck terminal: He wanted to test the north-side operation in order to see if the noise problem was abated. Because this was only a test, the lifting of the order was to be in effect only until the Selectmen’s meeting on May 5.
However, there was a second session of the Show Cause hearing on May 2, 2000. On the following day, another Cease and Desist order was issued.[9] Gauthier took this action, as he wrote to Severance, because at the Selectmen’s hearing, it was determined that “due to”[10] language in the Special Permit and the continued noise complaints, the order needed to be reissued. Therefore, on May 3, 2000 for the second time, Severance Trucking company was notified to cease and desist all truck loading and unloading on the north side of the building in the evening after 8:00 PM.
At this meeting, the Selectmen had voted to amend the permit conditions to remove any question that internal loading of trucks could not take place after 8:00 PM on the north side of the building. The reissuance of the Cease and Desist order was consistent with that interpretation.
I find that, despite the Selectmen’s action, the Building Inspector’s enforcement decision of May 3, 2000 was independent and not the product of any influence. This is based on his statement on July 27, 2000 that he acted independently,[11] his subsequent statements consistent with that statement, and my unwillingness to credit his testimony before me that now (in 2007), he doesn’t believe he was acting independently. I find that now, he is biased in Severance’s favor and against the Town, likely due to his subsequent termination by the Town Manager.
I heard no evidence whatsoever that any selectmen or member of the Zoning Board of Appeals had any conversation with Gauthier about enforcing the Special Permit except for Shaw’s telling him to “do something about it.” I find no evidence of direct intimidation from any selectman. The counsel for the town was freely available to Gauthier for consultation.
Dennis Piendak had a conversation with Gauthier where he pointed out to him his obligations and responsibilities to do the job of Building Inspector and enforce compliance with the zoning regulations. I have no testimony or evidence that Piendak had any conversation with Gauthier that could be taken as intimidating. Other than telling the Building Inspector that he should attend the April 11 meeting because the selectmen wanted to discuss Severance, and expressing that the Building Inspector should read the Special Permit and listen to tapes of the meeting to familiarize himself with the representations made by Severance, I find no effort to direct or influence Gauthier’s exercise of discretion in any way. [12]
Gauthier proffered no evidence that would allow me to infer that he was intimidated or pressured into taking any enforcement action with respect to Severance. First, I note that he is a mature man of considerable experience who has worked in other towns and is certified as a building inspector or commissioner. He claims that he felt intimidated because the selectmen and town manager were his “bosses,” and he believed that if he did not satisfy the town manager and the Board of Selectmen they could end his job.
Gauthier had several independent discussions with Severance personnel regarding the noise and spent time with them in order to monitor the situation. He also had a number of conversations with Attorney DiMento. Plaintiffs dismissed him as a party in this lawsuit. I infer that Gauthier has developed a close affinity for Severance.
At this trial, Gauthier has sworn that he does not now believe that his issuance of the Cease and Desist orders was a product of his own independent judgment but that he was pressured and intimidated to bring these Cease and Desist orders by the Selectmen and Town Manager.
When he was deposed in June 2000 in the instant case, Gauthier said that the two Cease and Desist orders were a product of his independent opinion. Gauthier testified before the Zoning Board of Appeals on July 27, 2000 when his two Cease and Desist orders were appealed to that forum. Again, he stated that when he issued the orders in question, they were the result of his own independent judgment.
He was consistent with this testimony in June of 2004 when in a lawsuit that he brought against the Town as a result of his termination,[13] he answered an interrogatory averring that the two Cease and Desist orders issued against Severance were based on his own independent assessment on the situation. But now, before this Court, he attempts to disclaim the June 2004 averment by saying that his attorney wrote it.
Gauthier has also testified in this court[14] that he changed his view on the interpretation to be given the Special Permit after his deposition in June 2000, i.e., after being cross-examined on the point by plaintiffs counsel.
I do not find Gauthier to be credible. He has dramatically changed his position on his own independence. He was partisan and resistant when testifying. *661 Gauthier’s demeanor was not consistent with truth telling and I decline to accept it.
However, I find the testimony of Town Manager, Dennis Piendak to be entirely credible. I find that the town received a number of complaints about noise from the Severance Trucking facility which were appropriately referred to the Building Inspector for action by the Town Manager. I am convinced that neither the town nor Mr. Piendak nor the Board of Selectmen had any desire whatsoever to close Severance Trucking.
Mr. Piendak, I find, is an experienced professional who was well-aware of the Zoning Act and the Town’s Zoning Bylaws. He had supervisoiy authority over the Building Inspector. He had the authority to discharge Gauthier and ultimately did so. He had no authority to demand enforcement action of the Building Inspector, and was very aware of the Building Inspector’s range of discretion. I fully credit his statement that he did not intimidate or pressure Gauthier to take any enforcement action in this case.
Severance appealed the two Cease and Desist orders and was represented before the ZBA by Attorney Dimento. Severance brought two specific objections: 1.) That Severance had not received the benefit of an independent Building Inspector, and 2.) That the terms of the Special Permit allowed north side internal truck loading after 8:00 PM. The meeting was open to public comments. All requirements of the Zoning Act with regard to notice to the public of this hearing were met.
Attorney Dimento made a full presentation to the ZBA as to both of these claims.
Building Inspector Gauthier presented his findings to the Zoning Board of Appeals on July 27, 2000. He recounted the histoiy regarding the noise complaints and the fact that he had witnessed the noise level on an abutter’s property. He was insistent before the ZBA that his enforcement orders were the result of his independent determination and the failures of Severance to address the sound problems.
The ZBA specifically questioned Gauthier as to whether the Selectmen had influenced his enforcement orders and were reassured of his independence. The ZBA considered whether Gauthier was acting independently in his enforcement efforts and decided he was free of influence.
The ZBA discussed and carefully parsed the language in the Special Permit in order to determine if the Building Inspector had interpreted its meaning correctly. While the panel was dissatisfied with the wording, they concluded that the permit precluded loading and unloading on the north side of the building after 8:00 PM. One member of the ZBA (Campbell) recognized the implications of this restriction in a cross dock facility;[15] he had come to understand the nature and requirements of a cross dock truck terminal independently of the hearing and through his work.
Members of the public spoke.
The interpretation of the Special Permit utilized by Gauthier to issue his enforcement orders coincided with that reached by the Board. This interpretation of the plain terms of the Special Permit was identical to that reached by this Court.[16]
The ZBA voted 4-1 to uphold the enforcement decisions of the Building Inspector.
LEGAL DISCUSSION
The standard for reviewing a local zoning board decision pursuant to Mass. Gen. L. ch. 40A, §17 is well established. In essence, the court is required to hear de novo all issues raised on appeal, make independent findings of fact and determine the legal validity of a zoning board’s decision upon the facts found. See Roberts v. Southwestern Bell Mobile Syst, Inc., 429 Mass. 478, 709 N.E.2d 798, 804 (1999) (citing Josephs v. Bd. of Appeals of Brookline, 362 Mass. 290, 285 N.E.2d 436, 439 (1972)). A zoning board’s decision carries no particular evi-dentiary weight on appeal. Id. However, in order to set aside a zoning board’s decision, the court must find, in light of all the evidence, that the decision was “based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary.” MacGibbon v. Bd. of Appeals of Duxbury, 356 Mass. 635, 255 N.E.2d 347, 350 (1970).
Mintz v. Roman Catholic Bishop of Springfield, 424 F.Sup.2d 309, 316 (2006).
It is undisputed that Severance was loading and unloading trucks through the north side of the terminal building in February, March and April 2000. On appeal, plaintiff has brought forward two issues regarding the upholding by the ZBA of the Building Inspector’s enforcement orders: a.) that Severance had not received the benefit of an independent Building Inspector, and b.) that the terms of the Special Permit allowed north-side internal truck loading after 8:00 PM. The latter issue has been decided against the plaintiff in the other Land Court action consolidated here; see the Memoranda of Decision in Land Court #264032.
As to a.), plaintiff claims the decision here to uphold the Building Inspector’s enforcement order is based on legally untenable ground, and is unreasonable, because the plaintiff was not afforded the independent judgment of a Building Inspector acting in good faith. Castelli v. Board of Selectmen of Seekonk, 15 Mass.App.Ct. 711, 714 (1983). Plaintiff claims Gauth-ier was influenced and intimidated by the Board of Selectmen. Plaintiff has not met its burden to establish that the Selectmen or Town Manager Piendak intimidated or influenced Gauthier.
There is no evidence of any effort to influence or pressure Gauthier directly by any member of the Board of Selectmen or the Town Manager, and I have found there were no such efforts.
*662 Plaintiff argues that Gauthier was intimidated because he felt he had to please the Board of Selectmen and the Town Manager (“his bosses”) or be fired. I have found that the Town Manager took no action to interfere or influence Gauthier’s decision with regard to enforcement matters at Severance.
“The chief administrative officer of each city or town shall employ and designate an inspector of buildings or building commissioner . . .” M.G.L.c. 143, §3. While the Zoning Act, M.G.L.c. 40A, §7, and the Dracut Zoning Bylaws at 1.11.10 give the Building Inspector the discretion to enforce zoning regulations, he surely must carry out his statutoiy responsibilities[17] in a fashion acceptable to the Town.
The evidence permitted me to find that Gauthier was ultimately terminated by Piendak and the Town. He brought suit against the Town; this was settled under the terms of a confidentiality agreement. This Court is of the view that Gauthier’s undertaking of an investigation of the complaints at Severance without an examination of the Special Permit he was charged with enforcing was unreasonable and well below the standard of performance expected of a Building Inspector. I am satisfied that whatever threat Gauthier felt to his continued employment by the Town was a product of real performance deficiencies, and not an effort to injure Severance.
On April 12, 2000, Gauthier entered his first Cease and Desist order instructing Severance not to permit any truck loading or unloading on the north side of the building after 8:00 p.m. I have found this to have been an independent act, despite his letter to Severance that “it had been pointed out to him” at the Selectmen’s meeting of April 11 that Stipulation 2(d) meant exactly that. I conclude that, due to his failure to read the stipulation until just before the meeting, a pointed discussion was required so that he would understand the terms of the permit.
I also have found that, despite the Selectmen’s action, the Building Inspector’s enforcement decision of May 3, 2000 was independent and not the product of any influence. This is supported by his subsequent consistent statements, which are at odds with his recent and partisan testimony.
Further, I have found that the interpretation of the Special Permit stipulation 2c.) and 2d.) utilized by Gauthier, and found by the Board was identical to that reached by this Court. It bears no further discussion but to say that the Board’s decision that there could be no truck loading or unloading on the north side of the building after 8:00 PM was reasonable.
Consequently, the decisions reached by the Building Inspector to order Severance to cease and desist from north-side loading, which were upheld by the Zoning Board of Appeals, were not based on a legally untenable ground, and were not unreasonable, whimsical, capricious or arbitrary in any way.
CONCLUSION
This Court concludes that the Zoning Board of Appeals decision upholding the Cease and Desist orders of the Building Inspector were not based on legally untenable grounds, and were not unreasonable, whimsical, capricious or arbitrary in any way.
Judgment is to enter in this action for the defendants.

 The Court has corrected a previously undetected error of omission on the final page. The addition is the critically important word “not” italicized in this amended version.

 See MEMORANDUM OF DECISION ON JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT.

Memorandum of decision on question one of BIFURCATED JURY-WAIVED TRIAL (#264032).

See MEMORANDUM OF DECISION ON JURY-WAIVED TRIAL (#264032).

The dispute about the meaning to be ascribed to this term is the subject of Land Court #264032.

This essential fact is undisputed (although not stipulated) by the plaintiff, it being plaintiffs position that such loading and unloading activity was permitted by the express terms of the Special Permit. This Court has found otherwise.

This is anomalous in that he had issued a building permit which would have required him to read what authorization the town had given the Plaintiff to constmct the facility.

This Court has previously ruled that the Town was without jurisdiction to take those actions; that is the subject of the other Land Court action.

In some documents and herein, this is referred to as the reissuance of the April 12 order.

Gauthier disavowed this statement to the ZBA, saying he did not write well, and that this “due to” statement was incorrect. He was responding to citizen complaints, he said, not the Selectmen.

 He told the ZBA he would have taken the enforcement action regardless of the Selectmen’s action.

Gauthier was eventually terminated by Piendak and the town, apparently due to performance issues.

I infer that Gauthier alleged that he was terminated because he exercised independent judgment, in the face of pressure from the Town to do otherwise.

See amended findings of fact in Memorandum of Decision of Bifurcated Trial.

Campbell was also of the opinion that the ineffective enforcement efforts of the Selectmen was a public expression of the Town’s position that Severance was in violation because they made a decision that only the Building Inspector was authorized to make. Apparently, Campbell felt that the Selectmen thereby forced the hand of the Building Inspector. The Court finds more persuasive the insistence of Gauthier through June 2004 that his enforcement actions against Severance were independent and free of influence.

See discussion in Memorandum of Decision on Question One of Bifurcated Jury-Waived Trial.

“The Building Inspector, upon being informed in writing of a possible violation of this By-law or on his own initiative, shall make or cause to be made an investigation of facts and an inspection of the premises where such violation may exist.” Dracut By-Laws, 1.11.10 He must act in a “fair, judicial, and reasonable manner upon the evidence.” Castelli, id.